CHALMERS & SON *v.* BOWEN.

Opinion delivered March 9, 1914.

1. REPLEVIN—PLEADING—VARIANCE.—A cause will not be reversed because defendant, in a replevin suit, set up title under a contract made in 1911, and proved title under a contract made in 1912, where both contracts were alleged, and it was also alleged that the property was part of that purchased in 1912. (Page 67.)

2. SALE OF CHATTELS—BULKY PROPERTY—DELIVERY.—An actual delivery of ponderous or bulky property, such as a large quantity of shells piled on a river bank, in order to complete a sale thereof is not necessary, a symbolical or constructive delivery being sufficient. (Page 67.)

3. PRINCIPAL AND AGENT—APPARENT AUTHORITY OF AGENT—SALES.— Where an agent had sold property to defendant and the same had been delivered, a jury could find that a similar sale was within his apparent authority, which, in the absence of notice to the contrary, would be equivalent to actual authority. (Page 68.)

4. PRINCIPAL AND AGENT—AUTHORITY—BURDEN OF PROOF—GENERAL AGENCY. —Where an agent is acting for his principal, he will be presumed to be a general agent, in the absence of notice to the contrary, and the burden is on the principal to show the limitations to his authority. (Page 69.)

5. PRINCIPAL AND AGENT—APPARENT AUTHORITY—LIABILITY OF PRINCIPAL —INSTRUCTIONS.—Instructions in a replevin suit, that plaintiff could not recover if the property was purchased from his agent acting within the apparent scope of his authority, and that plaintiff could recover if the agent had no authority to make the sale, and defendant had knowledge, *held* not to be conflicting. (Page 70.)

Appeal from Clay Circuit Court, Western District; *W. J. Driver*, Judge; affirmed.

### STATEMENT BY THE COURT.

The plaintiffs, Harvey Chalmers & Son, instituted this action against J. R. and J. A. Bowen to recover the possession of about thirty tons of mussel shells of the alleged value of $600. The case was tried before a jury, which returned a verdict for the defendants, and the plaintiffs have appealed.

The defendants were engaged in the business of cutting blanks for buttons from mussel shells. In July, 1911, they entered into an oral contract with Louis Igert, as agent for the plaintiffs, to buy from them mussel shells for the purpose of cutting blanks for buttons, and the blanks cut by them were to be sold to the plaintiffs. Pursuant to this contract, they purchased, at different times, quantities of mussel shells from the plaintiffs, and on the 19th day of March, 1912, there was a settlement between the parties whereby the defendants paid to the plaintiffs the sum of $982.50. These shells had been

taken out of the river by one W. M. Corley, and the plaintiffs had advanced him money for that purpose. In the settlement the following receipt was given by the plaintiffs:

"Corning, Ark., March 19, 1912.

"Chalmers & Son has this day received of J. R. Bowen and J. A. Bowen the sum of nine hundred and eighty-two and 50/100 dollars ($982.50), the same being for mussel shells upon which said Chalmers has advanced money to W. M. Corley.

"Harvey Chalmers & Son,

"By E. M. Denniston, Agent."

Corley had taken out a lot of mussel shells on Black River, at Booser's Landing, near Corning, Arkansas. The agents of Corley took up the shells from the diggers and weighed them as he bought them and placed them in a pile. Corley had an agreement with the plaintiffs that they would pay him a certain price for the shells at that place, and they had advanced him on the shells so piled there the sum of $2,500, but there had been no settlement or agreement between them as to the exact amount of shells in the pile. Corley then went to another place and his whereabouts could not be ascertained by the plaintiffs. In the meantime he had made an agreement with a bank at Newport to act for him, and the cashier of the bank, acting for Corley, authorized Louis Igert, an employee of the plaintiffs, to go to Corning and take up these shells. Upon inquiry, Igert ascertained that the defendants had taken a lot of shells from this pile. Igert loaded two cars of the shells for shipment to Black Rock and moved them from the landing on the river into the yards of the Iron Mountain railroad. The defendants took possession of one of these cars and unloaded it at their plant, and the plaintiffs have brought replevin for the shells.

*F. G. Taylor* and *Jones & Campbell*, for appellant.

1. The allegations in the answer tender an issue on a contract made in 1911, but undertake to show title under a contract made in 1912. The instructions given

at defendant's request, and the testimony upon which they were based, were not in conformity with the answer. Newman, Pl. & Pr. 523; 46 Ark. 136; 37 Ark. 599; 89 Ark. 147-150; 73 Ark. 221-224.

2. The evidence is conclusive that Igert had no authority to make the alleged sale, and that appellees knew it. The fourth instruction, therefore, is erroneous in that it is "based upon a hypothesis unsupported by the evidence," and tends to confuse the jury as to the real issue in the case. 90 Ark. 104-108.

The fifth instruction is directly in conflict with the above. 99 Ark. 377.

The proof wholly fails to establish a completed sale to vest title in appellees. 90 Ark. 131.

*G. B. Oliver,* for appellees.

1. The answer not only alleges a contract in 1911 for such shells as appellees desired to take, but also a contract in March, 1912, whereby "defendants purchased from plaintiffs all the Corley shells that were left at the agreed price of $15 per ton," etc., and the evidence conclusively established this contract.

2. Igert had authority to make the sale. It appears by the evidence that Denniston, who was general manager for appellants, had charge of all this territory, which appellees knew, and had bought the Canfield shells from him through Igert; also that Denniston and also Corley authorized Igert to weigh the shells in controversy and sell them to appellees. Certainly, Igert was acting within the apparent scope of his authority, and appellant is bound thereby. 96 Ark. 456.

HART, J., (after stating the facts). It is first insisted by counsel for plaintiffs that defendant set up title to the shells under a contract of purchase made in 1911 and at the trial undertook to prove title under a contract made in 1912. On this account they contend that the judgment should be reversed. It is true the answer of the defendants alleges that they made a contract in 1911 with plaintiffs for such shells as the defendants desired, but the answer further alleges that about

the last of March, 1912, after defendants had taken and paid for a large lot of shells under the former agreement "defendants purchased from plaintiffs all the Corley shells that were left at the agreed price of fifteen dollars per ton; that they weighed up a part of such shells on said date, and that the shells in controversy are a part of the said Corley shells purchased about the last of March, 1912." Therefore the defendants were entitled to judgment, under their answer, provided the proper proof was made to sustain the averments made in it.

It is next insisted by counsel for plaintiffs that there is no evidence to support the verdict. E. M. Denniston was the agent for the plaintiffs for the purchase of mussel shells and had charge of all territory as far north as the Illinois River, and all the Ohio, Wabash, Illinois and Mississippi Rivers, and all the South, Tennessee and Kentucky included. He testified that the defendants applied to him to purchase the shells in controversy and he refused to let them have them after the settlement of March 19, 1912, was made. Louis Igert, another employee of the plaintiffs, testified that in the latter part of March or the first of April, 1912, in company with one of the defendants, he went to the place where the shells in controversy were piled on the bank of the river for the purpose of weighing them out and selling them to the defendants; that they weighed out about five hundred pounds of the shells and that the defendants refused to take them in the condition they were in; that there was no sale of the shells made by him to the defendants, and that they were never weighed out or delivered to them.

On the other hand, the defendants introduced testimony tending to show that some time in the early part of April, 1912, the defendants went with Mr. Igert to the place on the river bank where the shells were piled up and agreed to buy them at the price of fifteen dollars per ton, delivered at that place; that they began to weigh the shells out and had weighed about 580 pounds when one of the defendants suggested that there was so much

mud in the shells that they should wait until they had dried out before they finished weighing them; that Mr. Igert agreed to this and told him that he could consider that the shells belonged to them under the agreement; that he told them to weigh them out when they got dry and that he would take their weights.

Under this testimony, the jury might have found that the shells were delivered to the defendants. In the case of *McDermott* v. *Kimball Lumber Company,* 102 Ark. 344, the court held:

"Where property is of such a nature and so situated that actual delivery can be made, that is necessary; but where the property is too ponderous and bulky for an actual change of its possession, a symbolical or constructive delivery, as by placing on it outward *indicia* of a change of possession and ownership, will be as effective as an actual delivery."

Igert, at the trial, also gave the following evidence in reference to a sale of the shells to the defendants:

Q. After you had been to the telephone office, didn't you come back and tell them it would be all right?

A. I don't remember.

Q. You had the right, didn't you?

A. I guess I did; I don't remember.

Q. You had the right to weigh these shells and turn them over?

A. I suppose I did; yes, sir.

Mr. Denniston was the general agent for the plaintiffs in buying shells in the State of Arkansas, and had charge of that territory. He admitted that he had told Igert to let the defendants have some other shells, and also admitted that other shells which they had purchased from Corley had been sold by Igert for the plaintiffs to the defendants and had been delivered to them. Under this proof, although Igert testified that he did not have authority to sell the shells to the defendant, the jury might have found that he did have such authority, or at least that it was within the apparent scope of his authority to sell and deliver them to the defendants.

In the case of *Oak Leaf Mill Co.* v. *Cooper,* 103 Ark. 79, the court said:

"A principal is not only bound by the acts of the agent done under express authority, but he is also bound by all acts of a general agent which are within the apparent scope of his authority, whether they have been authorized by the principal or not, and even if they are contrary to express directions. The principal in such case is not only bound by the authority actually given to the general agent, but by the authority which the third person dealing with him has a right to believe has been given to him. *Brown* v. *Brown,* 96 Ark. 456. The question in all such cases relative to the acts of a general agent is, not whether the authority of such agent was limited, but whether the person dealing with such agent had knowledge or notice of such limitations of his authority. In the absence of notice to the contrary, a person dealing with an admitted agent has a right to presume that he is a general agent, and that he is acting within the scope of his authority. 1 Clark & Skyles on Agency, § 200; 31 Cyc. 1645. If the authority of such general agent is actually limited, the principal is still bound for any act done or contract made within the apparent scope of his authority, in the absence of notice to the contrary by a person dealing with him. The burden is upon the principal to show such notice to or knowledge by the person dealing with him."

The court, on its own motion, gave, over the objection of the plaintiffs, instructions Nos. 4 and 5, which are as follows:

"If you find from the evidence that defendants purchased from Louis Igert, and that Igert was the agent of the person entitled to the possession of the shells, whether plaintiffs or William Corley, the balance of shells remaining on bank of Black River at Booser's Switch, and further find that Louis Igert was at the time acting within the scope or apparent scope of his authority as such agent, and that it was agreed between the parties at the time that such shells, while at said place, were the

property of defendants, you will find for defendants''
(No. 4).

''If you find from the evidence that Louis Igert had
no authority from plaintiffs or William Corley, the per-
son or persons entitled to the possession of the shells,
to dispose of the shells in controversy, and that defend-
ants had knowledge of such limitations of authority, or if
you find from the evidence that Igert was authorized by
plaintiffs or William Corley to weigh the shells at Boo-
ser's Switch and to sell and deliver such shells according
to such weight to defendants, and that Igert was only
authorized to make 'sale under such condition, and that
such fact was known to defendants, you should find for
plaintiffs'' (No. 5).

It is contended by counsel for plaintiff that these in-
structions are in conflict with each other. They contend
that the instruction No. 5, in effect, tells the jury that
Igert must not only have not had authority to sell the
shells to the defendants, but that the defendants must have
had knowledge that he had no authority, before a verdict
could be returned for plaintiffs. They contend that the
instruction, in effect, told the jury that Igert did have
apparent authority, either from the plaintiffs or Corley.
We can not agree with them in their contention. Accord-
ing to the evidence of the plaintiffs, Louis Igert had no
authority, either from them or from Corley, to dispose
of the shells in controversy, and instruction No. 5 simply
told the jury that if the defendants had knowledge of
such limitations of the authority of Igert their verdict
should be for the plaintiffs. This instruction was cor-
rect under the principles of law decided in the case last
quoted from. Instruction No. 4 submitted to the jury
the question of the apparent scope of the authority of
Louis Igert. That is to say, it was the contention of the
defendants that they had no knowledge that the plaintiffs
had limited the authority of Denniston or of Igert, and
they sought to defeat the action of the plaintiffs on the
ground that, according to the testimony introduced by
them, Igert, at the time he sold and delivered the shells

to them, was acting within the apparent scope of his authority as agent for the plaintiffs, and this theory of the case they had a right to have submitted to the jury, which was done under instruction No. 4. The two instructions are not in conflict and submitted the respective theories of the parties to the jury.

We find no prejudicial error in the record, and the judgment will be affirmed.