Don FARLEY;  Robert Mendenhall,
Appellees,

v.

William R. HENSON, Jr.;  Paul M. Henson;  Bowes Lyon Resources Ltd.;  National Transport Services, Inc., Defendants,

Westark Specialties, Inc., Appellant.

Don FARLEY;  Robert Mendenhall,
Appellees,

v.

William R. HENSON, Jr., Defendant,

Paul M. Henson, Appellant,

Bowes Lyon Resources Ltd.;  National Transport Services, Inc.;  Westark Specialties, Inc., Defendants.

Nos. 91–1620, 91–1621.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1991.

Decided Dec. 15, 1993.

828

W. Asa Hutchison, Fort Smith, AR, argued (Gregory T. Karber and John D. Alford, on the brief), for Westark Specialties, Inc.

Alfred Love, Ozark, MO, argued, for appellant Henson.

Laurence L. Pinkerton, Tulsa, OK, argued, for appellee.

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BOWMAN, Circuit Judge.

Appellee Don Farley is the former proprietor of a trucking company called Hi–Way Express ("HWE"). Appellee Robert Mendenhall is the former proprietor of a trucking company named Transport Leasing, Inc. ("TLI"). In 1988 Farley and Mendenhall sold their companies to Bowes Lyon Resources, Ltd. ("Bowes Lyon"), which owned a third trucking company named National Transport Services ("NTS"). Prior to its acquisition by Bowes Lyon, NTS was largely owned by Bill Henson, Jr., and by one of the appellants, Paul Henson. These men, to-

gether with their father Bill Henson, Sr., owned and operated the other appellant, Westark Specialties, Inc. ("Westark"). Bowes Lyon consolidated HWE, TLI, and NTS into an operation also known as Hi-Way Express ("Combined Hi-Way").

This arrangement collapsed. Farley and Mendenhall filed suit in the District Court[1] asserting claims under Arkansas common law; the Arkansas Securities Act, Ark.Code Ann. §§ 23–42–101 to –508 (Michie 1987) ("ASA"); § 12 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77l (1988); § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1988); and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1988) ("RICO"). The case proceeded to trial against Paul Henson and Westark. The jury found for Farley and Mendenhall on all of their claims and awarded Farley $1,600,000 in damages for common law fraud, $1,643,000 in damages for securities act violations, and $3,000 in RICO damages. Mendenhall was awarded $222,000 in damages for common law fraud, $126,110 in damages for securities violations and $3,000 in RICO damages. The District Court entered judgment in accordance with the jury verdict, and ordered Paul Henson and Westark jointly and severally liable for the amounts awarded. Paul Henson and Westark now appeal.[2]

Westark argues (1) that the evidence was insufficient to support appellees' common law fraud and federal securities laws claims and (2) that the damages awarded on those claims were excessive and not supported by the evidence. Paul Henson does not appeal the jury's determination that he is liable, but joins Westark's challenge to the damages awarded to Farley and Mendenhall. Neither Henson nor Westark appeals any aspect of the judgment in favor of appellees on their RICO claims. We reverse the award of dam-

ages to Mendenhall on his securities laws claims and remand for a new trial on that aspect of his damages. In all other respects, we affirm.

**I.**

During the relevant events, Westark was almost completely owned by the Henson brothers. Bill Henson, Sr., owned one share of its stock, but also held irrevocable proxies to vote his sons' shares. Westark's board of directors was composed of Bill Henson, Sr., who served as its chairman; Paul Henson, who also served as Westark's president; Bill Henson, Jr., who was a vice president of the company and managed Westark's numerous investments; and David Ashby, who was Westark's controller and secretary-treasurer. The Henson brothers were also NTS's two major stockholders; Paul Henson was on NTS's board of directors and his brother was its chairman.

In the spring of 1987, Bill Henson, Jr., and Farley began to discuss a merger of NTS and HWE. Farley was told that, in addition to their ownership of Westark, the Henson family owned and operated NTS. Bill Henson, Jr., introduced Farley to Paul Henson, telling him that Paul was Westark's president and an owner of NTS. During these discussions (which lasted through the summer), Bill Henson, Jr., also travelled to Vancouver, British Columbia, to meet several directors of Bowes Lyon, a Canadian shell company that was listed on the Vancouver Stock Exchange, and to talk with Canadian investment firms that might be interested in underwriting an offering of Bowes Lyon stock.[3] These talks were fruitful and Bill Henson, Jr., became a director of Bowes Lyon on July 7, 1987, a position he held until early 1988 when he became its chairman.

---

1. The Honorable Franklin Waters, Chief United States District Judge for the Western District of Arkansas.

2. During the pendency of these appeals, both Paul Henson and Westark filed bankruptcy petitions. Consequently, as we held in *Farley v. Henson*, 2 F.3d 273, 275 (8th Cir.1993), these appeals were subject to the automatic stay in bankruptcy. 11 U.S.C. § 362(a)(1) (1988). The

stay subsequently has been lifted by the bankruptcy court as to both appeals, and we now proceed to issue our decision on their merits.

3. By merging with a publicly traded Canadian shell corporation, a privately-held American company positions itself to raise capital by means of a public offering of newly issued shares of the Canadian company.

A merger of NTS with Bowes Lyon was approved by Bowes Lyon's directors in August 1987. Events began to move quickly toward a public offering of Bowes Lyon stock on the Vancouver Stock Exchange. These plans included Bowes Lyon's acquisition of Westark. On November 13, 1987, the Hensons granted Bowes Lyon the "sole and exclusive option to acquire . . . all of the issued and outstanding shares of Westark" in exchange for "an increase in the number of free trading shares, and resulting decrease in the number of escrowed shares, to be issued to [the Henson brothers] as consideration for Bowes' acquisition of [NTS]." Letter of Intent from Bowes Lyon Resources Ltd. to William R. Henson, Sr., William R. Henson, Jr., and Paul M. Henson (Nov. 13, 1987). [hereinafter "Westark Option"]. This exchange was to be made on the basis of one share of Bowes Lyon for each $1.46 of Westark's assets, "as determined by an independent evaluation of Westark." *Id.* Three days later, five Canadian brokers agreed to offer 1,000,000 Bowes Lyon shares on the Vancouver Stock Exchange.

The Henson brothers told Farley that the Bowes Lyon deal would include both NTS and Westark. During the Henson/Farley negotiations, Bill Henson, Jr., also began to talk with Mendenhall, who was told that the Hensons owned Westark, about merging TLI with NTS. Toward the end of November 1987 Farley and Mendenhall held a meeting with the Henson brothers during which Bill Henson, Jr., repeated his earlier representations. Several months later, Farley spoke with Bill Henson, Sr., and Henson told him the combination of HWE, Westark, NTS, and Bowes Lyon "was really going to be a good deal for everybody and [that] it was going to be a good way to build a big company and make a lot of money." Tr. Vol. II at 205. According to both Farley and Mendenhall, the Hensons' representation that Westark would be part of the Bowes Lyon combination was a central inducement for their ultimate agreement to sell their trucking businesses to Bowes Lyon.

As part of its normal procedure, the Vancouver Stock Exchange required Bowes Lyon to issue a Statement of Material Facts, containing an accurate and current portrayal of the company's affairs, as a prerequisite to the public offering of Bowes Lyon stock. The Statement of Material Facts was put into final form on January 20, 1988, and NTS began to receive money from stock purchases almost immediately thereafter. Almost as quickly NTS transferred $200,000 of this money to Westark, which used it to purchase Bowes Lyon stock. Bowes Lyon raised roughly $1.2 million from the public offering; the transferred sum represented almost one-sixth of its capital thus raised.

The terms for Bowes Lyon's purchase of TLI and HWE were largely settled in February 1988. Farley was offered employment as president and chief executive officer of Combined Hi–Way, $500,000 cash, and 2.6 million shares of Bowes Lyon stock valued at $1.15 per share. Mendenhall was promised a management position, 228,000 shares of Bowes Lyon stock valued at $1.15 per share, and $30,000 cash. Both Farley and Mendenhall were promised they would be freed from guarantees they had previously signed to underwrite their companies' financial obligations.

Later that month TLI moved into Combined Hi–Way's trucking facilities in Fort Smith, Arkansas. These facilities (valued at over $1,000,000) were actually owned by Westark, which allowed the Bowes Lyon subsidiary to use them without paying rent. Farley moved HWE into the building several months later, thereby bringing about the physical combination of the companies. Farley later questioned the Henson brothers about the state of Combined Hi–Way's books. Although the brothers repeatedly told Farley that all the records were present, Farley was unable to locate some of them.

Discrepancies in the books, and other unpleasant surprises, made Farley reticent about consummating the sale of HWE. He gave the brothers a new draft agreement, which they declined to accept. Instead they offered Farley options for 650,000 additional Bowes Lyon shares; 250,000 shares were to be optioned to him by Bowes Lyon and the remaining 400,000 shares by the brothers. The HWE sale was closed on September 20, 1988. The closing, with the Henson brothers

and Farley present, was held at the office of John Alford, an attorney who, in the past, had represented the brothers, their father, Westark, and Combined Hi–Way. Farley received $500,000 cash at closing.

By this time the brothers owned seventy percent of Bowes Lyon's stock and were firmly ensconced in management positions within the company. Bill Henson, Jr., was chairman of its board of directors and Paul Henson was an officer.

In November 1988, Farley and Mendenhall attended a meeting of Bowes Lyon's board of directors where they learned, by means of an agenda that included the "Acquisition [of] Westark ... in total stock swap by December 1, 1988," that Westark was not part of Bowes Lyon. Bowes Lyon Board Meeting, Nov. 11, 1988, Agenda. Paul Henson explained this to Farley by saying the "only reason" Bowes had not acquired Westark was that a "fairness opinion" had not been rendered. Tr. Vol. I at 212.

The TLI sale was closed on November 30, 1988, in a meeting among the brothers, Mendenhall, and Alford. Mendenhall received $30,000 cash at closing.

As early as the HWE closing in September, Bill Henson, Jr., and Alford were aware of a threat to sue Bowes Lyon that had been made by attorneys for a Tennessee trucking company with whom the Hensons had negotiated regarding a possible merger with Bowes Lyon. Although neither Mendenhall nor Farley was told of the threatened lawsuit, they learned of it several months later when Mendenhall was served with a complaint alleging the Tennessee company had suffered four million dollars in damages as a result of the brothers' conduct. Bill Henson, Jr., told Farley and Mendenhall he could "get rid of that thing with a hundred thousand dollars." Tr. Vol. I at 220. Farley and Mendenhall were not so blithe, and decided to commence this suit.

Farley never received his option shares. As to the value of appellees' 3,478,000 Bowes Lyon shares, controller Ashby told the jury that Westark's own Bowes Lyon stock was "going to be written off, and we'll probably take those certificates and wallpaper a bathroom. It's worthless." Tr. Vol. IV at 167.

## II.

We turn first to Westark's contention that the evidence was insufficient to support the jury's verdict finding Westark liable to Farley and Mendenhall for common law fraud. The District Court rejected this contention in denying appellants' post-trial motions. We review this issue under the same rigorous standard employed by the District Court in its consideration of judgment notwithstanding verdict and:

> (a) consider the evidence in the light most favorable to the prevailing party, (b) assume that the jury resolved all conflicts of evidence in favor of that party, (c) assume as true all facts which that party's evidence tended to prove, (d) give that party the benefit of all favorable inferences which may reasonably be drawn from proved facts, and (e) [affirm the denial of] the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence.

*McGee v. South Pemiscot School Dist. R–V*, 712 F.2d 339, 343 (8th Cir.1983).

The District Court's instruction to the jury on the common law fraud claim, given by the court without objection, sets forth the essential elements of common law fraud:

> First, that a defendant made a false representation or concealed the existence of a material fact, having a duty to reveal it;
>
> Second, knowledge or belief on the part of the defendant that the representation was false when he made it, or that he did not have a sufficient basis of information to make it. If a fact is concealed, rather than affirmatively misrepresented, the defendant must have believed in its truth, and in its importance to the Plaintiff;
>
> Third, an intention to induce the plaintiffs to act or to refrain from action in reliance upon the misrepresentation or concealment;
>
> Fourth, justifiable reliance upon the representation on the part of the Plaintiffs in

taking action or refraining from it; and fifth, damage to the Plaintiffs resulting from such reliance.

Instruction No. 9, Tr. Vol. V at 125–26.[4] Farley and Mendenhall were required to prove each of these elements by a preponderance of the evidence, and the jury was so instructed. Having carefully reviewed the record, we are satisfied there is ample evidence to support the jury's verdict finding Westark liable on this claim.

At trial, Farley and Mendenhall relied on the doctrines of apparent authority and ratification to establish their case against Westark, and the jury was instructed (again, without objection) on these doctrines. Although the doctrines involve different factual issues, compare Southern Bauxite Co. v. Brown–Pearson Cash Feed Store, 172 Ark. 117, 288 S.W. 377, 379 (1926) (holding that when an agent's acts transgress his express or implied authority, his principal will be held liable if the principal fails to give notice that the authority has been limited or restricted), with Arnold v. All Am. Assurance Co., 255 Ark. 275, 499 S.W.2d 861, 866 (1973) (citing Arkansas law that holds principal ratifies agent's unauthorized acts when, with knowledge of unauthorized acts, he remains silent when he should speak or he accepts the benefit), the pertinent interrogatory only asked whether the jury found for Farley and/or Mendenhall. This interrogatory is a general verdict, the use of which ordinarily would require us to examine the evidence of both theories in order to affirm. Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1236 & n. 21 (8th Cir.1987), cert. denied, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988). Because Westark's main brief does not attack the sufficiency of the evidence of ratification, however, that issue is not before us and we do not address it. We confine our discussion to the question of the sufficiency of the evidence to establish the apparent authority of the Hensons to act for Westark.[5]

■ We have summarized the proof Arkansas requires for a finding of apparent authority as follows:

> Two elements must be established to support a showing of apparent authority: "(1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority."

Wal–Mart Stores, Inc. v. Crist, 855 F.2d 1326, 1331 (8th Cir.1988) (quoting Central Sur. & Ins. Corp. v. O. & S. Wholesale Co., 193 Ark. 523, 101 S.W.2d 167, 172 (1937) (quoted authority omitted)), cert. denied, 489 U.S. 1090, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). This inquiry focuses on "the authority which the third person dealing with [the agent] has a right to believe has been given to [the agent]." Southern Elec. Corp. v. Ashley–Chicot Elec. Co-op., 220 Ark. 940, 251 S.W.2d 813, 815 (1952) (quoting Harvey Chalmers & Son v. Bowen, 112 Ark. 63, 164 S.W. 1131, 1133 (1914) (quoted authority omitted)). In this regard, we are mindful that Arkansas courts have vigorously refused to permit closely-held or family-dominated corporations to injure others through their agents and then escape liability by retreating behind the punctilio of corporate form.[6] Arkansas has long held that "family ties, unaccompanied by any other facts or circumstances, will not justify an inference of agency—but such relationship is entitled to great weight, when considered with other circumstances, as tending to establish the fact of

---

4. The instruction is an accurate reflection of Arkansas law. See Interstate Freeway Servs., Inc. v. Houser, 310 Ark. 302, 835 S.W.2d 872, 873–74 (1992).

5. In reviewing the evidence on apparent authority, we also have reviewed the evidence on ratification. Were the ratification issue properly before us, we would have no hesitancy in finding the evidence on that issue sufficient to support the jury verdict.

6. See, e.g., Julian James Stores, Inc. v. Bennett, 250 Ark. 279, 465 S.W.2d 94, 96 (1971) (rejecting claim that majority shareholder's husband was incapable of binding family corporation to contract because there was no proof husband had been commissioned to enter into the contract, because "[t]o allow such a one-man corporation to avoid its owner's contract would be a fraud").

agency." *Schuster's, Inc. v. Whitehead,* 291 Ark. 180, 722 S.W.2d 862, 863 (1987).

We briefly summarize what Farley's and Mendenhall's evidence tended to show in support of their common law fraud claims against Westark. Farley and Mendenhall knew the Hensons owned Westark and that Paul Henson was its president. Bill Henson, Jr., persistently cultivated the understanding that he and his family owned and controlled Westark, that Westark was behind the NTS–Bowes Lyon operation, and that Westark would become part of Bowes Lyon upon the completion of the public offering. Paul Henson contributed to these representations. The representation that Westark would be a part of the Bowes Lyon combination was a central inducement for Farley and Mendenhall to sell their trucking businesses to Bowes Lyon. The Henson brothers used their positions within Bowes Lyon in ways that intensified the appearance of their authority over Westark. Bill Henson, Jr., kept Farley and Mendenhall informed about developments concerning the Bowes Lyon public offering, and the brothers attended the closing of the HWE and TLI sales. Farley and Mendenhall, in the presence of Paul Henson, listened as Bill Henson, Jr., explained how one-sixth of Bowes Lyon's publicly-raised capital had been transferred to Westark as easily as pocket change is given by one brother to another.[7] Viewing the evidence in the light most favorable to Farley and Mendenhall, reasonable jurors could conclude that Westark, Bowes Lyon, and NTS were synonyms for "Henson"; that each enterprise was a simple extension of the family's affairs; and that Farley and Mendenhall did not learn that Westark was not included in the Bowes Lyon combination until after they had relied to their detriment on the brothers' representations.

Our review of the record convinces us the evidence is sufficient to support the jury's verdict finding Westark liable on the common law fraud claims. Moreover, to the extent that appellants' post-trial motions sought a new trial on the ground that the verdicts were against the weight of the evidence, we see no cause to second-guess the District Court's refusal to order a new trial.

### III.

Appellants attack the damages awarded for common law fraud as excessive and not supported by the evidence.

■ First, they complain that the jury was incorrectly instructed that the "measure of damages is the fair market value of everything received by the plaintiffs had everything been as represented by the defendants, less the fair market value of everything actually received by the plaintiffs." Instruction No. 45, Tr.Vol. V at 157. No objection was made to this instruction and appellants' invocation of the plain error doctrine is unavailing. We are hardly inclined to say that an agreed-to but incorrect instruction on damages in a civil case is a fundamental miscarriage of justice. In any event, we cannot say the instruction is incorrect, since this Court has determined that Arkansas law countenances the benefit-of-the-bargain measurement. *See Union Nat'l Bank v. Mosbacher,* 933 F.2d 1440, 1443 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992); *see generally* Howard W. Brill, Arkansas Law of Damages § 35–7, at 490–91 (2d ed. 1990) (discussing Arkansas' use of benefit-of-bargain and out-of-pocket measures).

■ Henson and Westark also attack the sufficiency of the evidence of the damages. The record shows that Farley was promised $500,000 in cash; 2.6 million shares of Bowes Lyon stock represented to have a value of $1.15 each; and freedom from liability on his guarantees of HWE's obligations, the value

---

7. Westark's attempt to characterize this transfer as nothing more than an inter-corporate loan is unavailing. The promissory note that memorialized the transfer did not set forth a date for its payment. Indeed, no effort had been made to repay the loan until Paul Henson was deposed for this lawsuit. (The note was eventually satisfied by the transfer of real estate.) From this evidence the jury could reasonably infer the

of which he put at $2,878,000.[8] Farley was also given an option for an additional 400,000 shares of Bowes Lyon stock valued at roughly $296,000. These items' combined represented value was $6,664,000. Farley never received the optioned stock and was not freed from his guarantees. He did receive $500,000 cash and 2.6 million Bowes Lyon shares.

The record suggests that Bowes Lyon's chief value lay in its ability to function as a receptacle for investments in subsidiary ventures by stock offerings on the Vancouver Stock Exchange, that NTS was in precarious financial straits during the unfolding of the events that gave rise to this litigation, and that the money raised by the Bowes Lyon public offering was largely poured into the financial hole NTS had dug for itself. Thus there was evidence from which the jury could conclude that the Bowes Lyon shares Farley received were essentially worthless. Moreover, even assuming *arguendo* that Farley's 2.6 million shares of Bowes Lyon stock were worth their represented value, and accounting for the $500,000 cash he received, his award is little more than half the difference between this hypothetical value and the total represented value of the HWE sale.

Mendenhall was promised $30,000 in cash, 228,000 shares of Bowes Lyon stock valued at $1.15 each, and freedom from liability on his guarantees of TLI property. Mendenhall put the value of his guarantees at "close to" $225,000. Tr.Vol. II at 314.[9] The total represented value of this transaction is $517,200. Assuming *arguendo* that Mendenhall's shares were worth their represented value and accounting for the $30,000 cash he received, the actual value of the consideration he received was $225,200 less than the promised consideration for the sale of TLI. The jury awarded him an amount that was $3,200 less than this difference, an award that has sufficient support in the evidence.

Appellants have failed to demonstrate that Farley's and Mendenhall's awards are unsup-ported by the evidence or are "so excessive as to constitute plain injustice, or a monstrous or shocking result." *Potts v. Benjamin*, 882 F.2d 1320, 1326 (8th Cir.1989).

Henson and Westark make a variety of arguments in a forlorn hope that we will ignore the Arkansas Supreme Court, reject the benefit-of-the-bargain rule, and require Farley and Mendenhall to prove damages under the out-of-pocket theory. Insofar as their particular arguments may apply to the jury's decision, they are meritless. For example, Henson and Westark dwell on the fact that the only evidence as to the value of Farley's and Mendenhall's trucking companies was contained in Farley's and Mendenhall's own testimony, which was troubled by contradictions. Nothing prohibited Henson and Westark from offering their own valuations; indeed, they "explored [Farley's and Mendenhall's] opinions at length and effectively on cross-examination. The weight to be accorded [their] opinions is a matter for the jury and not this Court to determine." *Greenwood Ranches, Inc. v. Skie Constr. Co.*, 629 F.2d 518, 522 (8th Cir.1980).

■ Appellants' only potent argument rests on a case in which this Court rejected a claim that, since defendants' redemption of notes would be disallowed by a bankruptcy court, the notes should be included in a damage award. *Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir.1991), *aff'd sub nom.*, *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The Court held that since the estate had not proceeded against the redemptees they had not suffered a compensable injury. *Id.* at 1335. Appellants here argue that *Reves* prohibits reliance on the value of Farley's and Mendenhall's guarantees to support the awards because Farley and Mendenhall did not prove their creditors have compelled payment. This argument was available long before *Reves* was decided. *See Larson Mach., Inc. v. Wallace*, 268 Ark. 192, 600 S.W.2d 1,

---

transfer was in fact a gift that was "repaid" only after Henson heard the hounds barking.

**8.** Although appellees' brief claims a value of $2,800,000 for the guarantees, Farley testified to the larger figure.

**9.** Mendenhall now claims his guarantees were worth more. He testified to the above amount, and the exhibit that tabulated his damages has no entry on the matter. Plaintiff's Exhibit 33d.

13 (1980) ("It is a general rule of law that the indemnitee on an implied covenant for indemnity ... cannot recover ... upon a mere showing that [he] has incurred liability, but he must show that he has suffered actual loss by payment or satisfaction of a judgment or by other payment under compulsion."). Appellants did. not object when Farley and Mendenhall submitted the guarantees as part of their case for damages; this argument was raised for the first time in a reply brief filed more than six months after the jury returned its verdicts. The claim is waived and we do not find plain error. *Cf. Porterco Inc. v. Igloo Prods. Corp.*, 955 F.2d 1164, 1173–74 (8th Cir.1992) (finding no plain error in submitting question of law to the jury, which was not instructed thereon, since parties never sought resolution of issue by district court).

The common law fraud damage awards are affirmed.

## IV.

Westark next contends that the District Court erroneously refused to set aside the jury's findings that Westark was liable under the federal securities laws. Our standard of review has already been discussed; we conclude that the evidence. adequately supports the jury's findings.

Westark does not argue that Farley and Mendenhall failed to prove violations of the 1933 and 1934 Acts by Bowes Lyon and others, but argues the evidence is insufficient to hold Westark liable for those violations under the control-person and aiding-and-abetting doctrines. Control-person liability is created by § 15 of the 1933 Act,[10] which extends liability to persons who "control" violators of § 12. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n. 27, 96 S.Ct. 1375, 1389 n. 27, 47 L.Ed.2d 668 (1976). Section

20(a) of the 1934 Act[11] has the same effect on those who "control" violators of § 10(b). *See Deviries v. Prudential–Bache Sec., Inc.*, 805 F.2d 326, 329 (8th Cir.1986). "[A]iding-.and-abetting liability is a matter of common law," *Metge v. Baehler*, .762 F.2d 621, 624 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 *and* 474 U.S. 1072, 106 S.Ct. 832, 88 L.Ed.2d 804 (1986), that applies to claims under both the 1933 and 1934 Acts, *see Stokes v. Lokken*, 644 F.2d 779, 782–83, 785 (8th Cir.1981), *overruled in part, Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).[12] Because the interrogatories show the jury specifically relied on the control-person doctrine, we may affirm if the record supports that finding. *See Hinkle v. Christensen*, 733 F.2d 74, 76 (8th Cir.1984).

Although the federal Acts have separate control-person provisions, the same test for control-person liability applies to claims under either Act. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) ("Although § 15 is not identical to § 20(a), the controlling person analysis is the same."), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). The test is described in *Metge*, where this Court held that a control-person relationship exists whenever (i) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated. *Metge*, 762 F.2d at 631.

Based on our review of the record, we are satisfied that reasonable jurors could find that Westark actually exercised control over Bowes Lyon's general operations. The Westark Option is relevant to this issue. Bowes

10. 15 U.S.C. § 77*o* (1988)

11. 15 U.S.C. § 78t(a) (1988).

12. This Court held that non-sellers may be liable under § 12 if they were "in privity with the purchaser" or if their participation was a "substantial factor in causing the transaction to take place." *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir.1981). The Supreme Court rejected the

"substantial factor" test in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), which declined to address § 12(2) aiding-and-abetting liability, *id.* at 648 n. 24, 108 S.Ct. at 2079 n. 24, but limited § 12(1) liability "to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078.

Lyon was a thinly-capitalized corporation before it acquired NTS and made the subsequent public stock offering. The acquisition of NTS put a heavy drain on Bowes Lyon's finances; there was evidence that a large portion of the money raised by the public offering was used to retire NTS's old debts. These facts suggest Bowes Lyon would have benefitted from the acquisition of Westark, which Bowes Lyon had the right to effect by "an increase in the number of free trading shares, *and resulting decrease* in the number of escrowed shares, to be issued to [the Henson brothers] as consideration for Bowes' acquisition of [NTS]." Westark Option (emphasis added). Bowes Lyon had 7,122,456 escrow shares available for transfer to the Henson brothers. Paul Henson testified at his deposition that Westark was worth 1.2 million dollars, and that this value was somewhat higher between October 29, 1987, and April 1, 1988. This imprecision notwithstanding, the evidence reasonably permits the inference that there were enough escrow shares to permit Bowes Lyon to acquire Westark. Yet Bowes Lyon did not exercise this valuable, and apparently low-cost, option, and a reasonable jury could conclude that Bowes Lyon's disinterest in this potential windfall showed that Westark's management controlled the Canadian company's decisions.

As to Westark's potential to control the unlawful activity, Paul Henson was president and a director of Westark as well as an officer of Bowes Lyon. Bill Henson, Jr., was an officer and director of Westark as well as an influential Bowes Lyon director. There is evidence for the conclusion that each man induced or participated in the securities violations that accompanied the transactions at issue. For example, Westark's resources were used to prepare the Statement of Material Facts that was required as a prerequisite to the public offering of Bowes Lyon stock, and much of the information it set forth was obtained from Bill Henson, Jr. The Henson brothers and controller Ashby regularly used Westark's letterhead to correspond about Bowes Lyon's business with the Vancouver Stock Exchange and others. There was also direct testimony from Paul Henson that the jury reasonably could have viewed as an admission that he and Bill Henson, Jr., controlled Bowes Lyon.[13]

This Court has had occasion to note that the control-person "statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). We conclude there is sufficient evidence to support the liability of Westark as a control person.

Even if it were not clear from the interrogatories that the jury relied on the control-person doctrine, the evidence also is sufficient to hold Westark liable as an aider and abettor. Based on the District Court's instruction, to which Westark made no objection, in order to find Westark liable as an aider and abettor the jury had to be persuaded of only three things: (1) that a securities law violation had occurred, (2) that Westark had knowledge of the violation, and (3) that Westark knowingly rendered substantial assistance to others in the commission of the violation. Although Westark disputes the factual predicates for elements (2) and (3), we have reviewed the record and we conclude that it provides adequate support for the jury's verdict. In short, there is substantial evidence that Westark had the requisite guilty knowledge and that Westark knowingly rendered substantial assistance in the

13. In deposition testimony that was read to the jury, Paul Henson made the following statements:

Q: Now, my question, sir, did you participate on behalf of Bowes in making the decision not to exercise the *option to acquire* Westark?

A: I don't think on behalf of Bowes I did.

Q: You were a controlling shareholder, were you not, sir?

A: I was a—I think we know what. I was a controlling part of a controlling group.

Q: You and your brother represented a control group; is that your way of seeing it?

A: I think the only two shareholders together that were Bill and I, I think so. Yes.

Tr. Vol. IV at 8–9. Paul Henson vigorously disputed the inference that Farley and Mendenhall sought to draw from this testimony. This issue was for the jury, and we have been shown no reason to ignore the beneficial effect of this testimony on Farley's and Mendenhall's cases.

commission of securities fraud against Farley and Mendenhall.

## V.

Finally, Henson and Westark challenge the damages awarded to Farley and Mendenhall under the ASA and the federal securities acts. The jury awarded Farley a lump sum of $1,643,000 for the state and federal securities laws violations that it found. Similarly, the jury awarded Mendenhall a lump sum of $126,110 for these violations. Because the jury was not asked to apportion the awards among violations of the ASA, the 1933 Act, and the 1934 Act, we are required to find that the evidence of damages is sufficient under each theory. We accept, however, appellants' position that the ASA tracks federal law and, therefore, like appellants, we do not discuss the ASA. Appellants concede that if the damages awarded are good under the Federal Securities Acts, they also are good under the ASA.

■ The District Court's instruction on damages under § 12 of the 1933 Act sets forth the statute's formula that a defendant "shall be liable" for "the consideration paid for such security with interest thereon, less the amount of any income received thereon." 15 U.S.C. § 77l. This language sets forth a rescissory calculation designed to restore the plaintiff to the position he held before he entered into the wrongful transaction. *Randall v. Loftsgaarden,* 478 U.S. 647, 655–56, 106 S.Ct. 3143, 3148–49, 92 L.Ed.2d 525 (1986).

■ The evidence supports Farley's award under § 12. There is no evidence that his Bowes Lyon shares produced income. As previously mentioned, despite the Hensons' representations to the contrary, the Bowes Lyon stock was worthless. As to the price Farley paid for these shares, he testified HWE was worth between $3.5 and $3.6 million. In return, he received (after substantial delay) only $500,000. Although Henson and Westark object to the fact that Farley's own testimony provided the value of HWE and point to contradictions in that testimony, "[i]t is a rule in Arkansas that testimony of the owner of personal property concerning

the value of that property is sufficient evidence to prove value." *McCorkle v. Valley Forge Ins. Co.,* 11 Ark.App. 41, 665 S.W.2d 898, 901 (1984). We discern no reason why the Arkansas courts would not apply the same principle to testimony concerning the value of a business. The jury rejected appellants' attempt at rebuttal and we cannot second-guess its decision. *See Greenwood Ranches,* 629 F.2d at 522. There thus is evidence to support the conclusion that Farley paid, in net terms, approximately $3,000,000 for the worthless Bowes Lyon shares. Consequently, his verdict in the amount of $1,643,000 is supported by the evidence, and the District Court did not abuse its discretion in refusing to grant Henson and Westark a new trial based on the claimed excessiveness of the award.

We reach a similar result as to Farley's damages based on his 1934 Act claim. "Congress has not specified the remedies available to a defrauded buyer" under § 10(b) of the 1934 Act. *Harris v. American Inv. Co.,* 523 F.2d 220, 224 (8th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). Although out-of-pocket damages are not the only kind recoverable under § 10(b), *Reves,* 937 F.2d at 1336, neither party objected when the District Court followed the majority of cases by instructing the jury to employ the out-of-pocket formula. Under this formula, damages are "measured by the difference between the purchase price of the security and its actual value." *Harris v. Union Elec. Co.,* 787 F.2d 355, 367 (8th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986).

Appellants claim the highest value for HWE supported by the evidence is $1,000,000, "the amount for which [HWE] was offered to" Bill Henson, Jr. Brief of Westark at 34. They claim "Farley testified the [Bowes Lyon] stock was worth $.76 per share," and that when one computes the value of 2.6 million Bowes Lyon shares at this price and adds the $500,000 Farley was paid in cash, one must conclude Farley cannot have been injured. *Id.* They further assert that even if one assumes the Bowes Lyon stock was valueless, Farley's receipt of $500,000 in cash demands the conclusion that he

only suffered $500,000 in damages. These arguments are unpersuasive. Although the million-dollar figure was discussed by Farley and Bill Henson, Jr., the most favorable evidence is Farley's valuation of HWE at $3.5 to $3.6 million. Moreover, Farley did not testify his Bowes Lyon shares were worth seventy-six cents apiece; he testified the value of the shares optioned to him *was represented* as being seventy-six cents each. In any event, our previous discussion regarding the value of the Bowes Lyon stock shows there is evidence to support the conclusion that the Bowes Lyon stock was objectively worthless when Farley received it. Having reviewed the record, we cannot say the evidence is insufficient to support Farley's damages under the 1934 Act.

■ The evidence, however, does not support the award of damages on Mendenhall's securities laws claims. Mendenhall has not pointed to a single piece of evidence supporting the conclusion that TLI was worth $126,110, the amount of damages awarded. Based on our search of the record, it appears that his most favorable evidence is a Bowes Lyon financial statement indicating that TLI's net worth was a little more than half that amount. Mendenhall argues that his federal securities laws award should be sustained because in exchange for TLI he was to receive $30,000 in cash and 228,000 shares of Bowes Lyon stock represented to have a value of $1.15 per share, for a total consideration worth $292,000. Since he in fact received for TLI only worthless stock plus the $30,000, he contends that his $126,110 award is amply justified. We disagree. Although Mendenhall was to have received for TLI consideration with a total value of $292,000, it is "axiomatic that the value of consideration given by one party cannot be judged by equating it with the value of counter-consideration given by the other party." *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1036 (2d Cir.1979). We conclude that although Mendenhall may have been entitled to some damages on his securities act claims, a proper award on those claims could not exceed the value of TLI less the $30,000 in cash that Mendenhall was paid as partial consideration for the acquisition of TLI. Because the evidence of TLI's value does not support the

amount of the damages awarded on Mendenhall's securities act claims, those damages cannot be sustained. As asserted by appellants in their post-trial motions, the $126,110 award must be set aside. Appellants are entitled to a new trial on this portion of Mendenhall's damages.

VI.

The award of damages on Mendenhall's securities laws claims is reversed, and the case is remanded for a new trial on that aspect of Mendenhall's damages. In all other respects, the judgment of the District Court in favor of Farley and Mendenhall is affirmed.